MICHELLE BERGMAN, JEFFREY D.          :
BERGMAN, DAVID FRIEND, STEPS AWAY    :
AT STOWE MOUNTAIN LLC, PATRICK       :
SULLIVAN, SHELAGH SULLIVAN, KAREN    :
HESSE FLATOW, TALL PINES LLC, and    :
GEORGE WILSON, individually and on   :
behalf of a class of similarly       :
situated persons,                    :
                                     :
          Plaintiffs,                :
                                     :
     v.                              :    Case No. 2:11-cv-128
                                     :
SPRUCE PEAK REALTY, LLC and          :
STOWE MOUNTAIN LODGE, LLC,           :
                                     :
          Defendants.                :
                                     :

## MEMORANDUM OPINION and ORDER

Plaintiffs, owners of interests in residential units in the

Stowe Mountain Lodge Condominium ("Condominium"), brought two

class action suits against the developers of the Condominium,[1]

alleging that Defendants have illegally and fraudulently

allocated expenses and voting rights in order to favor their

commercial units; have illegally charged back to the residential

unit owners a substantial portion of the fees that Defendants

should be paying; have illegally charged residential units for

more than their share of the electricity bill; and have illegally

and fraudulently imposed exorbitant charges for so-called shared

---

[1] Defendant Spruce Peak Realty, LLC ("Spruce Peak") was the
original developer until Defendant Stowe Mountain Lodge ("SML")
succeeded it in 2007.

amenities services.  *See* Class Action Compl., ECF No. 1, *Bergman v. Spruce Peak Realty, LLC*, No. 2:11-cv-127 (D. Vt. filed May 13, 2011); First Am. Class Action Compl. ("FAC"), ECF No. 23.

Plaintiffs asserted that they were forced to split their claims because the Condominium documents contained inconsistent arbitration clauses.  The Declaration of Covenants, Conditions, Easements and Restrictions for the Condominium ("Declaration") contained a mandatory arbitration clause for all disputes arising under it, except for claims for indemnity or unpaid assessments. Decl. ¶ 12.18, ECF No. 23-1.  A covenant referenced in the Declaration, the Shared Amenities and Services Covenant ("SAS Covenant"), contained a permissive arbitration clause, but excluded owners from exercising any rights under it.  SAS Covenant ¶ 12.14, ECF No. 23-13.

In Docket No. 2:11-cv-127, in which Plaintiffs brought claims related to the Declaration, Plaintiffs sought and received a stay of proceedings pending arbitration.  *See* Mem. Op. & Order dated Nov. 14, 2011, ECF No. 33.  In this docket, in which Plaintiffs bring claims related to the SAS Covenant, Defendants have moved to dismiss Plaintiffs' FAC in its entirety for lack of subject matter jurisdiction, failure to plead fraud with particularity and failure to state a claim.  *See* Fed. R. Civ. P. 12(b)(1), 12(b)(6), 9(b).  For the reasons that follow, the motion, ECF No. 28, is **granted in part and denied in part.**

## Background

The following facts are drawn from the FAC, the Class Action Complaint in Docket No. 2:11-cv-127, and appended documents. The Condominium is a common interest community located on Mount Mansfield in Stowe, Vermont, consisting of residential units, held either in whole or fractional ownership; commercial units, consisting of the Retail Unit, the Spa Unit and the Shared Amenities Unit;[2] and common elements, which are the remaining portions of the Condominium—land, buildings and improvements—other than the residential and commercial units.

The Shared Amenities Unit is divided into an Exclusive Shared Amenities Unit Area that benefits Defendants exclusively (including the conference center, the ballroom, bar and restaurant) and the Shared Amenities Use Areas (including the lobby, the pool, the parking garage, reservation desk area and landscaped outdoor areas). Spruce Peak owns the Shared Amenities Unit. SML owns the Retail Unit, the Spa Unit and unsold residential units.

The Condominium was marketed as a four-star, full-service, high-end resort. The Condominium is managed by the Stowe Mountain Lodge Condominium Owners Association ("SMLCOA"). All unit owners are members of the SMLCOA.

---

[2] In 2005, when Defendants began marketing the Condominium, the Shared Amenities Unit was called the Hotel Services Unit.

Spruce Peak began marketing the Condominium in 2005, prior to its construction, through a Public Offering Statement ("2005 POS"). The 2005 POS explained that it was a summary description of the Condominium, and that a prospective purchaser should read the entire set of disclosure materials attached to the POS. 2005 POS 2, ECF No. 23-2. The 2005 POS appended as Schedules drafts of the SML Declaration, the Hotel Access and Services Covenant ("HAS Covenant") and the SMLCOA projected annual operating budget, among other documents.

The 2005 POS provided that the unit owners would share the cost of operating and maintaining the common elements of the Condominium. *Id.* at 17. The SMLCOA would be governed by a five-member Board of Directors. *Id.* at 18. The SMLCOA would collect assessments from the unit owners to cover the costs of operation, management and maintenance of the Condominium. *Id.* at 19. The 2005 POS presented a projected budget for the SMLCOA, but warned that the budget was based upon estimates of costs and expenses, that the budgeted expenses were subject to change, and that there was no guarantee that the SMLCOA would choose to maintain the level of services established by the budget. *Id.* at 25.

The 2005 POS projected condominium assessment for the first year of operation was $2866 for a studio unit and $11,465 for a three-bedroom unit. *Id.* In addition, the 2005 POS estimated "Master Association" assessments, constituting condominium common

expenses, as $483 for a studio unit, and $2415 for other units. *Id.* at 26. The 2005 POS also explained that unit owners would be granted access to and use of certain facilities and amenities located in the Hotel Services Unit, and that a Hotel Access and Services Fee would be collected from unit owners, as detailed in the HAS Covenant. *Id.* at 34-36.

The HAS Covenant covered the use of shared facilities and the allocation of shared facilities expenses. Shared facilities expenses would consist of "maintenance and operation expenses" and "hotel service expenses." HAS Covenant ¶ 7.2, ECF No. 23-3. Hotel services were defined as services—such as reception, check-in, reservations, bell staff, valet parking, charging privileges, ski and door attendants, pool, concierge and shuttle services—provided by the Hotel Services Unit owner primarily for the benefit of the "contributing owners," defined as the owners of the residential units. *Id.* Exs. C-1, C-2. The hotel services fee would accrue on a nightly basis based on actual usage, and the maintenance and operation fee would be invoiced on a quarterly basis. *Id.* Ex. C-2. The Hotel Services Unit owner would have complete control over the budget upon which these fees would be calculated, 2005 POS 36, and the residential unit owners would be responsible for the actual shared facilities expenses, if the fees assessed did not cover the actual expenses. HAS Covenant ¶ 7.2.2.

Under the HAS Covenant, a residential unit owner would be assessed $41 per night per bedroom for hotel services when the residential unit owner or a tenant occupied the unit. FAC ¶¶ 97-98.

In June 2005, many residential unit owners signed Purchase and Sale Agreements ("P&S Agreements") with SPR and paid non-refundable ten percent deposits. The P&S Agreements contemplated a completion date of June 30, 2007, subject to change. The P&S Agreements referenced the 2005 POS and its schedules, and advised purchasers that they would be responsible for Hotel Access and Services Fees, which "may be increased subject to the limitations set forth in the Condominium Governing Instruments and the [HAS Covenant]." P&S Agreement ¶ 11, ECF No. 23-4. It also advised that those documents were subject to modification and termination in accordance with their terms. *Id.* ¶ 21(b).

Sometime prior to April 2006, Defendants determined that they could not complete construction by June 2007. As a result they were required by the Interstate Land Sales Full Disclosure Act of 1968 ("ILSA"), 15 U.S.C. §§ 1701-1720 (2006), to provide a Property Report to all potential residential unit purchasers. *See id.* § 1707. In October 2006, SPR provided a Property Report to all prospective purchasers, including those who had previously signed P&S Agreements. The Property Report included a list of major costs, "subject to change." Property Report 33, ECF No.

23-10. The estimated amount of the Shared Services Contribution[3] would be $410 annually for a studio unit, and $1000 annually for a three-bedroom unit, based on ten days of owner usage, and would increase with higher use. *Id.* at 34. The Property Report did not mention that the residential unit owners would be responsible for actual expenses that exceeded the estimate.

At the same time SPR provided an amendment to each purchaser's P&S Agreement, which among other things replaced the terms "Hotel Access Unit Owner" with "Shared Amenities Unit Owner;" "Hotel Access and Services Covenant" with "Shared Amenities and Services Covenant ("SAS Covenant");" and "Hotel Access and Services Fee" with "Shared Amenities and Services Contribution." P&S Amendment, ECF No. 23-8. Purchasers who had signed P&S Agreements in 2005 were given the option of agreeing to the amendments or canceling their P&S Agreements. *Id.;* ECF No. 23-9.

In June 2007 all purchasers who had not cancelled their agreements paid an additional ten percent deposit.

On January 30, 2008, SML, as the successor to Spruce Peak, prepared a revised Public Offering Statement ("2008 POS"). The 2008 POS appended a revised SAS Covenant and a revised projected annual operating budget as schedules. *See* 2008 POS, ECF No. 23-

---

[3] "Shared Services" replaced the term "Hotel Services" that had been employed in the HAS Covenant.

11; SAS Covenant; Draft Operating Budget, ECF No. 35-1.  On February 18, 2008, SML sent purchasers who had signed a P&S Agreement and placed a deposit on a Condominium unit a letter enclosing a CD-ROM disk containing 758 PDF pages,[4] including a copy of the 2008 POS, marked to show the changes from the 2005 POS.  The letter stated "[m]ost of the changes are minor and are intended to make the language clearer, easier and/or more fair for all of our owners."  SML Letter, ECF No. 23-12.  The letter stated further:

> [I]n response to feedback from you, we have revised the way you will be billed for your portion of the Shared Services Contribution [formerly the Hotel Services Fee].  It is no longer a contribution that accrues nightly, but will be an annual cost, billed quarterly, regardless of occupancy of your unit.

*Id.*

Under the revised SAS Covenant, the Shared Amenities Unit owner continued to retain complete control over the Shared Amenities budget, SAS Covenant ¶ 1.5, and the residential unit owners continued to remain responsible for the actual shared amenities expenses, regardless of the budgeted amount.  *Id.* ¶ 7.2.2.

The change in the method of assessing the Shared Services Contribution meant that rather than $41 per night while the unit

_____

[4]  The Class Action Complaint in Docket No. 2:11-cv-127 states that the 2008 POS was contained in a 542-page PDF file on a CD-ROM disk.  Compl. ¶ 64.

8

was occupied, a studio unit owner would now be billed $6,892 per year, regardless of occupancy. Rather than $123 per night while a three-bedroom unit was occupied, the owner would now be billed $20,676 per year, regardless of occupancy. *See* Draft Operating Budget 3. Under the 2008 POS and the revised SAS Covenant, therefore, residential unit owners could not limit their occupancy to reduce their bill for shared services.

SML did not provide purchasers with the opportunity to cancel their P&S Agreements following their receipt of the 2008 POS and revised SAS Covenant. Nor did it provide a written amendment to the P&S Agreement noting a change in the method of estimating the residential unit owners' Shared Services Contribution. The revised projected annual operating budget did show the change in the shared services contribution, however.

Plaintiffs closed on the purchase of their units beginning in May 2008.

After repeated inquiries concerning their Shared Amenities and Services Contributions, Defendants agreed to provide a SAS budget presentation in February 2010. At the budget presentation, Plaintiffs learned that SPR as the Shared Amenities Unit Owner was allocating its Condominium assessment and charging the residential unit owners through their Shared Amenities and Services Contributions, allegedly in violation of the SAS Covenant.

According to the FAC, the residential unit owners complained to the SMLCOA Board of Directors in 2009 and 2010, and in 2010 SMLCOA requested mediation of the issues in dispute. No resolution was reached.

The Plaintiffs filed this lawsuit as a class action on May 13, 2011, seeking a declaration that the SAS Covenant is void and unenforceable. Alternatively, they request reformation of the SAS Covenant to comply with Vermont statutory and common law. As a further alternative, they seek rescission of their Condominium purchases. In addition, they seek damages for breach of the SAS Covenant, fraud and violations of state and federal law.

On the same day, Plaintiffs filed their companion class action lawsuit, seeking reformation of the Declaration to comply with Vermont statutory and common law, plus monetary damages for fraud and violations of state law. Pursuant to the Declaration's arbitration clause providing that "all disputes . . . arising under this Condominium Declaration between Shared Amenities Unit Owner, Declarant, the Resort Manager, the Condominium Association or the Condominium Association Manager, on the one hand, and any Owner, on the other hand, shall, upon the request of any party, be resolved by binding arbitration . . . ," Decl. ¶ 12.18, the Plaintiffs commenced a class arbitration proceeding before the American Arbitration Association. In their arbitration demand, they described the nature of the dispute as

> Class action arbitration brought by nine residential
> condominium owners as class representatives of 324
> residential owners against a condominium hotel
> developer for violations of Vermont statutory and
> common law. . . . including, inter alia, unlawfully
> discriminating in favor of developer-owned units in the
> allocation of common expenses and voting rights, the
> failure to pay the full amount of the developer's fees
> and assessments, and the failure to sub-meter
> electrical costs.

Arbitration Demand, Docket No. 2:11-cv-127, ECF No. 6-1.  On June 7, 2011, Plaintiffs moved for a stay of proceedings pending arbitration.  Docket No. 2:11-cv-127, ECF No. 6.  The motion was granted November 14, 2011.  *Id.* ECF No. 33.

## Discussion

### I.   Subject Matter Jurisdiction

Ordinarily, subject matter jurisdiction must "be established as a threshold matter," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998), and the Court accordingly turns first to Defendants' argument that Plaintiffs' suit must be dismissed for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) because individual unit owners lack standing to sue under the SAS Covenant.

"In every federal case, the party bringing the suit must establish standing to prosecute the action." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004).  "[S]tanding is gauged by the specific common-law, statutory or constitutional claims that a party presents." *Int'l Primate Prot. League v.*

*Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 77 (1991).  The
question of standing "involves both constitutional limitations of
federal-court jurisdiction and prudential limitations on its
exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  In cases
such as this one, where jurisdiction is based in part on
diversity of citizenship, "a plaintiff must have standing under
both Article III of the Constitution and applicable state law in
order to maintain a cause of action."  *Mid-Hudson Catskill Rural
Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 173 (2d
Cir. 2005).

Within a paragraph captioned "Arbitration," the relevant
portion of the SAS Covenant states:

> [I]n no event shall any Owner have the standing to
> exercise any rights under this [SAS Covenant].  In the
> event any such Owner is aggrieved and wishes to pursue
> a claim with respect to any provision hereunder or
> otherwise against Shared Amenities Unit Owner, such
> Owner may only do so through action it causes the
> [SMLCOA] to take on its behalf.

SAS Covenant ¶ 12.14.

Defendants argue that Plaintiffs lack standing because they
are "contractually barred" from bringing suit individually.
Defs.' Mem. 19, ECF No. 28-1.  Defendants do not appear to
contend that Plaintiffs lack Article III standing, i.e., that
Plaintiffs have not adequately alleged a concrete,
particularized, actual or imminent injury; fairly traceable to
the challenged action; that is redressable by a favorable

12

decision. *E.g.*, *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2752 (2010); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

The only prudential standing consideration that might arguably apply is whether Plaintiffs' claims fall within the zone of interests protected by the law invoked. *See Elk Grove*, 542 U.S. at 12 ("[P]rudential standing encompasses 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'") (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)); *accord Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 91 (2d Cir. 2009). Plaintiffs present state common law fraud and breach of contract claims, and violations of federal and state statutes, specifically the VCIOA, the Vermont Consumer Fraud Act and the ILSA. Their claims depend on the contentions that they were duped into buying their condominium units by relying on documents that contained material misstatements or omissions, that the SAS Covenant was illegally revised, and that the SAS Covenant is void and unenforceable. Such claims are clearly within the zone of interests protected by these laws.

In casting their argument as one of lack of subject matter

jurisdiction, Defendants essentially contend that the parties contracted to deprive a federal court of the power that it otherwise would have under 28 U.S.C. § 1331, § 1332(d) and § 1367(a) to entertain this suit. A district court would ordinarily have subject matter jurisdiction over an alleged scheme to mislead and defraud residential unit purchasers, where plaintiffs have properly alleged diversity jurisdiction, federal question jurisdiction and supplemental jurisdiction over their state claims. "A plaintiff properly invokes § 1331 jurisdiction when she pleads a colorable claim "arising under" the Constitution or laws of the United States. She invokes § 1332 jurisdiction when she presents a claim between parties of diverse citizenship that exceeds the required jurisdictional amount. . . ." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513 (2006) (citation omitted).

Defendants are actually making a merits argument that Plaintiffs fail to state a claim upon which relief can be granted because they did not cause the SMLCOA to act on their behalf against Spruce Peak. *See e.g.*, *Sarhank Group v. Oracle Corp.*, 404 F.3d 657, 660 (2d Cir. 2005) (distinguishing between lack of subject matter jurisdiction and failure to state a claim); *Da Silva v. Kinsho Int'l Corp.*, 229 F.3d 358, 362-64 (2d Cir. 2000) (discussing categories of disputes that do or do not concern subject matter jurisdiction); *see also Steel Co.*, 523 U.S. at 89

14

("It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional *power* to adjudicate the case.").

Sections 1331, 1332(d) and 1367 provide the bases for exercise of subject matter jurisdiction over Plaintiffs' claims, in the absence of any indication that the claims "'clearly appear[] to be immaterial and made solely for the purpose of obtaining jurisdiction or where such [] claim[s are] wholly insubstantial and frivolous.'" *Id.* (quoting *Bell v. Hood*, 327 U.S. 678, 682-83 (1946)). Plaintiffs' claims are neither insubstantial nor frivolous nor immaterial. "'Once a federal court has determined that a plaintiff's jurisdiction-conferring claims are not insubstantial on their face, no further consideration of the merits of the claim is relevant to a determination of the court's jurisdiction of the subject matter.'" *So. New England Tel. Co. v. Global NAPS*, 624 F.3d 123, 133 (2d Cir. 2010) (quoting *In re Stock Exchs. Options Trading Antitrust Litig.*, 317 F.3d 134, 150 (2d Cir. 2003)). The motion to dismiss for lack of subject matter jurisdiction is therefore **denied.**

## II. Duplicative Litigation

Before addressing Defendants' various additional grounds for

dismissal of Plaintiffs' claims, the Court sua sponte considers whether Plaintiffs' filing separate actions constitutes improper claim-splitting, notwithstanding their contention that inconsistent arbitration clauses forced them to do so. "The rule against claim-splitting requires a plaintiff to assert all of its causes of action arising from a common set of facts in one lawsuit." *Katz v. Gerardi*, 655 F.3d 1212, 1217 (10th Cir. 2011).

As the Plaintiffs themselves recognize, the two lawsuits arise from a common set of facts. *See* Compl. ¶ 6, Docket No. 2:11-cv-127 ("Plaintiffs were forced to split their claims into two separate cases . . . ."); FAC ¶ 12 ("Plaintiffs needed to split their claims into two cases . . . ."). A considerable number of the factual allegations of the complaints in both dockets are identical or substantially the same.

The suit on the Declaration, Docket No. 2:11-cv-127, has been stayed pending arbitration. The scope of the arbitration demand is broad: violations of Vermont statutory and common law, including three specific instances of conduct, *among other things.* Appended to the arbitration demand is a Class Action Arbitration Demand which tracks the Class Action Complaint in that docket virtually word for word. An entire subsection of that Demand/Complaint is devoted to the SAS Covenant and the Defendants' use of it to achieve a reduction of SPR's Condominium assessments, *see* Class Action Compl. ¶¶ 90-106, and it would

16

appear that a substantial amount of effort in the arbitration proceedings will be devoted to determining the appropriate treatment and interpretation of the SAS Covenant.

The SML Declaration's arbitration clause requires arbitration of "all disputes not involving claims for indemnity or unpaid Assessments and arising under this Condominium Declaration . . . ." Decl. ¶ 12.18. Should the arbitrator find that the class action is arbitrable,[5] the arbitrator may proceed to determine the scope of the arbitration. In determining the scope of the arbitration demand, the arbitrator may deem a dispute over a change to the SAS Covenant to be a dispute that arises under the Declaration. For one thing, the Declaration itself describes the SAS Covenant in its *Article III: Property Use Rights and Restrictions*, and refers the reader to the SAS Covenant for further details. *See* Declaration ¶ 3.12;[6] *but see ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307

_____

[5] Because the Declaration arbitration provision neither expressly permits nor prohibits class arbitration, the arbitrator will first determine whether the parties agreed to class arbitration.

[6] The Declaration provision reads:
    <u>Shared Amenities and Services Covenant</u>. Pursuant to the terms and conditions of the [SAS Covenant], including the payment of the Shared Amenities and Services Contribution, Owners are granted access to and use of certain facilities and amenities located in the shared Amenities Unit and are provided certain services by the Shared Amenities Unit Owner, as further described in the [SAS Covenant].
Decl. ¶ 3.12.

F.3d 24, 26 (2d Cir. 2002) (reaffirming that use of the precise phrase "arising under" in an arbitration clause results in a narrow arbitration clause that will not permit arbitration of a fraudulent inducement claim).

Assuming that the SML Declaration incorporated the SAS Covenant by reference, "under normal circumstances, when an agreement includes two dispute resolution provisions, one specific . . . and one general . . ., the specific provision will govern those claims that fall within it." *Katz v. Feinberg*, 290 F.3d 95, 97 (2d Cir. 2002) (per curiam). If the Plaintiffs' claims arise under the SAS Covenant, then the specific provision in the SAS Covenant will govern. Claims that fall outside the scope of either arbitration agreement, however, may proceed in this Court. *See Schlaifer Nance & Co. v. Estate of Warhol*, 764 F. Supp. 43, 46-47 (S.D.N.Y. 1991) (observing that parties' agreement to a limited arbitration clause entails agreement to split claims between arbitration and litigation); *see also Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985) (holding that agreements to arbitrate are rigorously enforced, "even if the result is 'piecemeal' litigation."). Therefore, despite the potential for piecemeal litigation, the Court will consider the remainder of Defendants' arguments for dismissal.

**III. 12(b)(6) Defenses**

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, a complaint must contain sufficient facts, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "'Conclusory allegations or legal conclusions masquerading as factual conclusions'" cannot withstand a motion to dismiss, however. *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (quoting *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002)). The question is not whether Plaintiffs may ultimately prevail, but whether they are entitled to offer evidence to support their claims. *Wright v. Ernst & Young LLP*, 152 F.3d 169, 173 (2d Cir. 1998).

**A.   The SAS Covenant Arbitration Clause**

Defendants have argued that Plaintiffs are barred from bringing suit on the SAS Covenant, because they have not caused SMLCOA to act on their behalf. Plaintiffs apparently concede that, as aggrieved owners wishing to pursue a claim with respect

to a provision of the SAS Covenant, they did not cause the SMLCOA
to take action on their behalf.[7] They argue instead, among other
things, that the clause is unconscionable and therefore
unenforceable.

Under Vermont law,[8] terms of a contract may be avoided as
unconscionable if they are procedurally or substantively unfair.
*See Val Preda Leasing, Inc. v. Rodriguez*, 540 A.2d 648, 651 (Vt.
1987). Unconscionability may be based upon

> "evidence of some overreaching on the part of one of
> the parties such as that which results from an
> inequality in bargaining power or under other
> circumstances in which there is an absence of
> meaningful choice on the part of one of the parties,
> together with contract terms which are unreasonably
> favorable to that party."

*Maglin v. Tschannerl*, 800 A.2d 486, 491 (Vt. 2002) (emphasis
omitted) (quoting *Davis v. M.L.G. Corp.*, 712 P.2d 985, 991 (Colo.
1986)). Thus, unequal bargaining power coupled with lack of
meaningful choice, plus unreasonably favorable contract terms,
may supply grounds for avoiding the terms of a contract on
unconscionability grounds. *Id.* at 490-91.

---

[7] The Court notes that, according to the FAC, Residential
Unit Owners brought their grievances to the SMLCOA, and the
SMLCOA engaged in mediation with them. *See* FAC ¶¶ 235-238. The
SMLCOA did not, apparently, pursue those claims with the Shared
Amenities Unit Owner. Nor, apparently, did Plaintiffs demand
that the SMLCOA act on their behalf.

[8] The SAS Covenant provides that it is governed by the laws
of the State of Vermont. SAS Covenant ¶ 12.10.

Plaintiffs list several factors which they contend support a claim that the SAS Covenant is both procedurally and substantively unconscionable, among them that the SAS Covenant is a contract of adhesion; that they had no opportunity to negotiate its terms; that significant features of the SAS Covenant were buried within hundreds of pages of documents; that residential unit owners may only pursue a claim by causing the SMLCOA to act on their behalf, whereas Defendants control the SMLCOA by virtue of the voting rights allocations; and that Spruce Peak may initiate a lawsuit against a residential unit owner for failure to pay the assessment, but the residential unit owner may only act through the SMLCOA, and such action must be resolved by binding arbitration at the request of either party.

Assuming the truth of these allegations, Plaintiffs have stated a claim that certain terms within the arbitration clause of the SAS Covenant are unenforceable as unconscionable. Plaintiffs are entitled to present evidence that the provision in the arbitration clause that forces them to act through the SMLCOA is unenforceable, and that therefore they are not contractually barred from bringing suit.

### B. Statutes of Limitations Defenses

**1.** Defendants argue that Plaintiffs' claims are time-barred because the Declaration and the SAS Covenant contain a

one-year limitations period for presentation of claims pertaining to the Declaration or the SAS Covenant.[9]  Acknowledging that under Vermont law a contractual provision that shortens a period of limitation is null and void, *see* Vt. Stat. Ann. tit. 12, ¶ 465 (2002), Defendants nevertheless assert that the one-year limit is valid because neither a covenant nor a declaration is a contract.

"A covenant is a contract, and damages are recoverable for its breach." *Pinckard v. Am. Freehold Land Mortg. Co.*, 39 So. 350, 351 (Ala. 1905), *quoted in Fine Foods, Inc. v. Dahlin*, 523 A.2d 1228, 1230 (Vt. 1986).  Given that Defendants conceded the point when they argued that Plaintiffs are "contractually barred" from bringing claims individually, citing the same provision of the SAS Covenant that contains the limitations period, their about-face four pages later warrants no further discussion. *Compare* Defs.' Mem. 19 *with* Defs.' Mem. 23.  Moreover, Defendants have argued at length that Plaintiffs' complaints about the SAS Covenant sound in contract, and admit that a covenant such as

---

[9]  The relevant provision in the SAS Covenant states: Any claim which any party has against another party pertaining to the matters set forth or referred to in this [SAS Covenant] must be presented by the claiming party to the other within one (1) year of the date the claiming party knew or should have known of the facts giving rise to the claim.  Unless the party against whom any claim is asserted waives the time limits set forth above, any claim not brought within the time periods specified shall be waived and forever barred. SAS Covenant ¶ 12.14.  The Declaration provision is identical, substituting Declaration for SAS Covenant.  Decl. ¶ 12.18.

this one imposes "contractual duties." *See* Defs.' Mem. 31-32;

Defs.' Reply Mem. 6-11, 27.  The provision in the SAS Covenant

that requires a party to present a claim within one year of the

date the claiming party knew or should have known of the facts

giving rise to the claim is null and void.  Vt. Stat. Ann. tit.

12, § 465.[10]

As to the validity of the Declaration's one-year limit,

briefly, Plaintiffs do not bring their claims in this docket

under the Declaration.  If they did, they would be subject to the

Declaration's mandatory arbitration provision.

**2.**  Defendants also argue that the statutory

limitations period under the ILSA bars Plaintiffs' § 1703(a)(1)

claim.  In Count V, Plaintiffs assert that Defendants violated §

1703(a)(1) when they eliminated the nightly usage fee and

---

[10]  The recent Vermont Supreme Court decision in *Estate of Alden v. Dee*, 2011 VT 64, ¶ 29, 35 A.3d 950, 960, does not impel a different outcome.  In a declaratory judgment action, trust beneficiaries had counterclaimed against the trustee for breach of fiduciary duty and fraud.  Remarking that "[a] trust is fundamentally different from a contract," and that the lawsuit was "not an action under a contract," the Court rejected the application of section 465 to void a trust document's sixty-day time limit for objecting to an annual accounting.  *Id.* Challenges to the trust distributions were therefore barred by the trust provision, although the six-year statute of limitations set forth in section 511 of Title 12, Vermont Statutes Annotated, still applied to the breach of fiduciary duty and fraud claims. *Estate of Alden* is not applicable in this case, which involves the interpretation of contractual terms:  the "promise of one unit owner to provide amenities or services to another unit owner in exchange for a fee," as Defendants characterize the SAS Covenant.  Defs.' Mem. 18.

instituted the annual contribution for shared amenities services, by failing to fully and accurately disclose in an amended Property Report the expected fees or charges to be paid. FAC ¶ 348; *see* 15 U.S.C. § 1703(a)(1). Among other things, § 1703(a)(1) prohibits a developer from selling a lot where any part of the Property Report contains an untrue statement of material fact or omits a material fact that must be disclosed. 15 U.S.C. § 1703(a)(1)(C). A purchaser may bring suit for a violation of § 1703(a)(1), and recover damages or equitable relief. *Id.* § 1709.

Section 1711(a) of the ILSA provides that "[n]o action shall be maintained . . . with respect to . . . a violation of subsection (a)(1) . . . more than three years after the date of signing of the contract of sale or lease." 15 U.S.C. § 1711(a)(1). The FAC does not specify when the parties executed P&S Agreements. It appears that some P&S Agreements or amended P&S Agreements were executed no later than June 2007, when the purchasers' second ten percent deposit was paid. There may have been other P&S Agreements executed no later than February 27, 2010. *See* FAC ¶ 60.

To be within the time bar, the sales contracts must have been signed no earlier than May 13, 2008, three years before the Class Action Complaint was filed on May 13, 2011. Plaintiffs assert that the three-year period does not begin to run until

both parties have signed "all the purchase contract documents,"
Pls.' Mem. 48, and that the SAS Covenant is one of the purchase
contract documents. They argue that the time period should run
from the time the SAS Covenant was signed and recorded.
According to Plaintiffs, the SAS Covenant was signed by
Defendants on May 16, and was recorded on May 19, 2008.

The statute, however, does not mention "purchase contract
documents," much less define them. Section 1711(a)(1) starts the
running of the limitations period from the *signing of the
contract of sale*. The parties do not dispute that the P&S
Agreement as amended is the contract of sale. *See* P&S Agreement
Recital C ("By this Agreement, Seller agrees to sell to
Purchaser, and Purchaser agrees to purchase from Seller the
Condominium Unit."); P&S Amendment. The SAS Covenant is referred
to (by its former name) in the Recital and Terms and Conditions
sections of the P&S Agreement, as the document that sets forth
the terms and conditions of access to and use of the hotel
services.

Plaintiffs have cited no authority for the notion that a
document referred to in an agreement of sale must itself be
executed for the contract of sale to have been signed. There is,
moreover, no reason to believe that purchasers sign the SAS
Covenant. Under Plaintiffs' interpretation of the statutory
language, a buyer could prevent the ILSA's statute of limitations

from running by failing to sign a document that does not require the buyer's signature.

Although Plaintiffs make a strong policy argument for a liberal construction in order to effectuate the remedial purpose of the Act, there is simply no ambiguity in the term "signing of the contract of sale" that would afford any leeway in interpretation. *Cf. Bodansky v. Fifth on Park Condo, LLC*, 635 F.3d 75, 83 (2d Cir. 2011) (holding that, for ILSA purposes, the time of sale is the date of signing a contract or agreement to purchase, and finding no ambiguity in the terms).

Plaintiffs' § 1703(a)(1) claim is time-barred for any Plaintiff whose P&S Agreement or amended P&S Agreement was executed before May 13, 2008. Count V is hereby **dismissed,** with leave to replead for those Plaintiffs if any whose P&S Agreements were executed on or after May 13, 2008, and who wish to pursue a § 1703(a)(1) claim.

### C.   ILSA § 1703(a)(2) Claim (Count VI)

The ILSA was originally "designed to prevent false and deceptive practices in the sale of unimproved tracts of land by requiring developers to disclose information needed by potential buyers." *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.*, 426 U.S. 776, 778 (1976). The Act applies to non-exempt condominium developments. *E.g.*, *Bodansky*, 635 F.3d at 76; *Winter*

26

*v. Hollingsworth Props., Inc.*, 777 F.2d 1444, 1449 (11th Cir. 1985). The ILSA's anti-fraud provision makes it unlawful for any developer to use the means or instruments of transportation or communication in interstate commerce or of the mails, with respect to the sale or offer to sell any lot:

> (A) to employ any device, scheme, or artifice to defraud; (B) to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale . . .) not misleading, with respect to any information pertinent to the lot or subdivision; [or] (C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser . . . ."

15 U.S.C. § 1703(a)(2).

Plaintiffs allege that Defendants violated the ILSA by failing to disclose that they would be charged for payment of a portion of the Condominium assessments allocated to the Shared Amenities Unit through the SAS Covenant. FAC ¶ 352. Defendants contend that this claim is deficient because the ILSA does not apply to the SAS Covenant, and even if it did, there was no failure to disclose.

By its language, the ILSA applies to any sale or offer to sell a lot where a scheme to defraud has been employed, or money or property has been obtained through material false statements or omissions, or a fraud has been perpetrated upon a purchaser. The statute does not limit or categorize the types of documents

that may trigger civil liability for a violation.  If a trier of fact could find that the Defendants employed the SAS Covenant in such a fashion in connection with the sale of residential units, then Defendants may be held liable.

Defendants state, correctly, that the ILSA does not require developers to provide purchasers with an exhaustive list of all assessments that may become due, but Plaintiffs make no such allegation.  They allege that Spruce Peak has been charging a portion of its own condominium assessments to residential unit owners in the guise of Shared Amenities and Services Contributions, and that by this scheme the residential unit owners are being billed for expenses that are not directly related to the operation and maintenance of the Shared Amenities Use Areas.  Assuming the truth of these allegations, however, it is not clear that they state a claim for relief under the ILSA.

Although Plaintiffs have sufficiently alleged conduct that may plausibly demonstrate a material nondisclosure, it is not clear from the FAC that this conduct occurred with respect to the sale or offer to sell the residential units, or that Defendants made use of any means or instruments of transportation or communication in interstate commerce or the mails to engage in prohibited activities.  According to the FAC, the scheme came to light at the budget presentation in February 2010, and through subsequent communications.  FAC ¶ 218.  Section 1703(a)(2)

prohibits certain activities in connection with the sale or offer of sale of a unit.  Although the scheme may have been in place by June 2007, and the omission of this information may have been material to a purchaser's decision to buy, these essential elements of a § 1703(a)(2) claim have not been pled.

Plaintiffs have failed to state a claim for relief in Count VI, and it is therefore **dismissed,** with leave to replead the facts if any that may support the omitted essential elements.

### D.    VCIOA Claims

The Vermont Common Interest Ownership Act ("VCIOA" or "Act"), Vt. Stat. Ann. tit. 27A, §§ 1-101 to 4-120 (2006 & Supp. 2011), applies to most common interest communities created within the State after the VCIOA's effective date of January 1, 1999. *Id.* § 1-201.  A common interest community is defined as "real estate described in a declaration with respect to which any person, by virtue of the person's ownership of a unit, is obligated to pay real estate taxes on; insurance premiums on; maintenance of; or improvement of any other real estate other than that unit described in the declaration."  *Id.* § 1-103(7).  A condominium is defined as "a common interest community in which portions of the real estate are designated for separate ownership and the remainder of the real estate is designated for common ownership solely by the owners of those portions."  *Id.* § 1-103(8).  "Common elements" are "all portions of the common

interest community other than the units." *Id.* § 1-103(4)(A).

Plaintiffs have alleged that the VCIOA applies to the implementation of the SAS Covenant, and that its implementation violates the VCIOA in several ways, including 1) requiring residential unit owners to pay a portion of the condominium assessments that are allocated to the Shared Amenities Unit; 2) permitting the Shared Amenities Unit Owner to pay a reduced amount rather than its full share of the Shared Amenities and Services Contribution; 3) failing to provide access to financial records; 4) failing to permit Plaintiffs to vote on the budget for the Shared Amenities Services; and 5) unlawfully discriminating in favor of declarant-owned units. FAC ¶¶ 316-317.

Defendants concede that the Declaration created a common interest community, specifically a condominium, and that the common interest community is governed by the VCIOA. They argue that the SAS Covenant is not within the scope of the VCIOA, but is a separate agreement that sets forth the terms and conditions for the provision of shared amenities services. Assuming Defendants correctly describe the SAS Covenant as a separate agreement, that fact does not as a matter of law place matters concerning the SAS Covenant outside the protections of the VCIOA.

The VCIOA governs the creation and management of common interest communities, and provides protection to purchasers. *See*

Vt. Stat. Ann. tit. 27A. Arts. 2, 3, 4. Among the VCIOA's protections is the requirement that a declarant prepare a public offering statement conforming to various requirements of the Act before selling a unit. *Id.* § 4-102. Among these requirements, a public offering statement must accurately disclose "[a]ll unusual and material circumstances, features and characteristics of the common interest community and the units." *Id.* § 4-103(17).

Defendants cannot dispute that they were required to disclose the terms and conditions of the SAS Covenant in the 2008 POS. A section of the 2008 POS entitled "Unusual and Material Circumstances and Characteristics of [SML] Condominium or Spruce Peak Master Community" summarizes the SAS Covenant, describes the Shared Amenities Unit, states that the Shared Amenities Unit Owner has agreed to grant access subject to the obligation to pay the Shared Amenities and Services Contribution, summarizes the shared amenities services, and refers the reader to the SAS Covenant for further details. 2008 POS ¶ Q. Regardless of whether the SAS Covenant is "part of the common interest community" as Plaintiffs argue, relevant provisions of the VCIOA govern unusual and material circumstances or characteristics of a common interest community, such as the terms and conditions set forth in the SAS Covenant. Declarants may be liable for misrepresentations and material omissions in a public offering statement, Vt. Stat. Ann. tit. 27A, § 4-102(c), as well as for

31

failure to comply with any provision of title 27A or any provision of the declaration or bylaws. *Id.* § 4-117(a). The terms and conditions of the SAS Covenant are specifically referenced in the Declaration. Defendants cannot achieve dismissal of Plaintiffs' VCIOA claims by simply asserting that the VCIOA does not apply to the SAS Covenant.

Defendants also argue that the arrangement between Spruce Peak as the Shared Amenities Unit owner and the residential unit owners complies with the VCIOA. That may or may not prove to be true, but at this stage of the litigation, all Plaintiffs must do to survive dismissal is allege a claim for relief that is plausible. This they have done.

### E.  Vermont Consumer Fraud Act Claim

The Vermont Consumer Fraud Act ("VCFA"), Vt. Stat. Ann. tit. 9, §§ 2451-2480n (2006 & Supp. 2011), prohibits "unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce." *Id.* § 2453(a). A deceptive act or practice "is a material representation, practice or omission likely to mislead a reasonable consumer." *Bisson v. Ward*, 628 A.2d 1256, 1261 (Vt. 1993). A well-pleaded VCFA claim must allege that (1) defendants misrepresented or omitted information in a manner likely to mislead consumers; (2) the consumers interpreted the message reasonably under the circumstances; and (3) the misleading representation was material in that it

affected the consumers' purchasing decision. *Jordan v. Nissan N. Am.*, 2004 VT 27 ¶ 5, 853 A.2d 40, 43.

Defendants argue that Plaintiffs may not bring a claim under the VCFA, because Plaintiffs are not citizens of Vermont. The VCFA affords "any consumer" who has been harmed by unfair methods of competition in commerce or unfair or deceptive acts or practices in commerce a right to sue for damages or equitable relief. Vt. Stat. Ann. tit. 9, § 2461(b). A consumer is "any person who purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or services . . . ." *Id.* § 2451a(a). The express legislative intent of the VCFA "is to complement the enforcement of federal statutes and decisions governing the unfair methods of competition and unfair or deceptive acts or practices in order to protect the public, and to encourage fair and honest competition." *Id.* § 2451. The Vermont Supreme Court "has repeatedly held that the VCFA is 'remedial in nature' and therefore must be construed 'liberally so as to furnish all the remedy and all the purposes intended.'" *Elkins v. Microsoft Corp.*, 817 A.2d 9, 13 (Vt. 2002) (quoting *State v. Custom Pools*, 556 A.2d 72, 74 (Vt. 1998)). The VCFA does not impose a citizenship requirement in order to invoke its protections, but in plain language extends a remedy to consumers. Whatever the outer limits of the statute's reach may be, *see Sherman v. Ben & Jerry's Franchising, Inc.*, No. 1:08-CV-207, 2009

WL 2462539 at *9 (D. Vt. 2009) (holding that nonresident
franchisees had an insufficient nexus to the state to be Vermont
consumers), purchasers of condominium residential units in Stowe,
Vermont, meet the VCFA's definition of consumer.

Defendants have also suggested that a VCFA claim must be
pled with the specificity required by Rule 9(b).  The Vermont
Supreme Court drew an important distinction between common law
fraud and Vermont's Consumer Fraud Act in *Poulin v. Ford Motor
Co.* when it refused to require a statutory consumer fraud claim
to satisfy the higher standard of proof by clear and convincing
evidence that a common law fraud claim must meet.  513 A.2d 1168,
1172 (Vt. 1986).  The Court stated:

> The mere fact that the word 'fraud' appears in the
> title of our consumer protection statute does not give
> rise to an inference that the legislature intended to
> require a higher degree of proof than that ordinarily
> required in civil cases.  The purpose of our Consumer
> Fraud Act is to protect consumers by adding a claim for
> relief that is easier to establish than is common law
> fraud.  To require the higher degree of proof would
> frustrate the legislative intent.

*Id.*  It is likewise not likely that the Vermont legislature
intended to require a heightened pleading standard for claims for
relief under the VCFA.  *Cf. Pelman v. McDonald's Corp.*, 396 F.3d
508, 511 (2d Cir. 2005) (holding that an action under New York's
Deceptive Practices Act is not subject to the requirements of
Rule 9(b)).  Although this Court does not believe that a VCFA
claim must satisfy the Rule 9(b)'s heightened pleading standard,

it is unnecessary to decide the issue in this case.  Except as discussed below, Plaintiffs' VCFA claim has alleged facts with sufficient particularity to notify Defendants of "'the who, what, when, where, and how'" of the claim.  *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 327 (S.D.N.Y. 2003) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)).

The FAC alleges that Defendants violated the VCFA 1) by failing to fully and accurately disclose the expected fees or charges when they instituted the SAS Covenant's annual contribution without regard to occupancy; 2) by failing to disclose that Plaintiffs would be charged for payment of a portion of the Condominium assessments allocated to the Shared Amenities Unit; and 3) by failing to disclose that Plaintiffs would be charged for expenses associated with operating and maintaining the Exclusive Shared Amenities Use Area.  FAC ¶¶ 59-60.

Defendants assert that their written disclosures destroy any VCFA claim.  They point out that their February 18, 2008, letter that accompanied the 2008 POS advised that they had changed the billing for the Shared Services Contribution:  "It is no longer a contribution that accrues nightly, but will be an annual cost, billed quarterly, regardless of occupancy of your unit."  SML Letter, ECF No. 23-12.  The letter referred to the relevant schedules to review to understand these changes, including a

revised operating budget. The budget set forth the expected Shared Services Contribution as $6892 annually for studios and $20,676 annually for three-bedroom units. Draft Operating Budget, ECF NO. 35-1.

The summary letter certainly put Plaintiffs on inquiry notice that their Shared Services Contribution had changed and would likely increase. The details were ascertainable by reviewing the revised budget that was supplied with the 2008 POS and to which the letter referred. Plaintiffs have pleaded sufficient facts, however, "to state a claim to relief that is plausible on its face." *Iqbal*, 129 S. Ct. at 1949. Specifically they have alleged that Defendants failed to fully and accurately disclose the expected fees, that "most" of the changes were characterized as "minor" and buried in hundreds of pages of documents, that they did not understand the impact of the revision, and that the change materially affected purchasers' financial obligations within months of their closings on their units.

The failure to disclose the allocation of Shared Amenities Unit assessments and the expenses for the Exclusive Shared Amenities Use area, however, fails to satisfy Rule 8's pleading standard. This information came to light, according to the FAC, in February 2010. Plaintiffs have not pled that failure to disclose these schemes affected their decision to purchase their

units, nor is that a reasonable inference that may be drawn from the facts as alleged.

Accordingly, Plaintiffs' VCFA claims in Count III and relevant portions of Count I with regard to the allocation of Shared Amenities Unit assessments and charges for Exclusive Shared Amenities Use Area expenses are **dismissed for failure to state a claim,** with leave to replead facts if any that may support the omitted essential element of a VCFA claim with respect to the allocation of Shared Amenities Unit assessments and expenses for the Exclusive Shared Amenities Use area.

### F. Common Law Fraudulent Concealment Claim

In Vermont,[11] a claim for fraudulent concealment must allege "'concealment of facts by one with knowledge, or the means of knowledge, and a duty to disclose, coupled with an intention to mislead or defraud.'" *Lay v. Pettingill*, 2011 VT 127, ¶ 14, ___ A.3d ___ (quoting *Silva v. Stevens*, 589 A.2d 852, 857 (Vt. 1991)). Defendants argue that the FAC does not adequately allege concealment of facts, duty to disclose or intention to mislead or defraud.

The FAC, however, alleges concealment of the following facts: 1) that the Shared Amenities and Services Contribution could not be ascertained from the SAS Covenant; 2) that

---

[11] Defendants have accepted the application of Vermont law to this claim for purposes of this motion.

residential unit owners pay for benefits the commercial unit owners enjoy in the Shared Amenities Use Area; 3) that the Shared Amenities Unit Owner has been charging a portion of its Condominium assessments in its Shared Amenities and Services Contribution calculation; 4) that the Defendants are using an allocation that is not authorized by the SAS Covenant; 5) that residential unit owners are being billed for expenses in violation of the SAS Covenant; and 6) that residential unit owners are paying property taxes attributable to the Exclusive Shared Amenities Unit Area that should be paid by Spruce Peak. *See* FAC ¶¶ 201, 203, 218, 221, 224-226.  This satisfies Rule 9(b)'s particularity requirement.

With regard to a duty to disclose, the FAC states that "[t]he duty to disclose can arise from a relationship of trust and confidence, superior knowledge or means of knowledge," and that "Defendants had a duty to disclose to Plaintiffs all material facts concerning the Condominium units including without limitation the expected cost of services under the SAS Covenant." FAC ¶¶ 341, 342.  It is of course well established that a "duty to disclose can arise from a relationship of trust and confidence, superior knowledge or means of knowledge." *Roy v. Mugford*, 642 A.2d 688, 693 (Vt. 1994) (citing *Silva*, 589 A.2d at 857).  In their opposition brief, Plaintiffs specify that they rely on a duty to disclose based on the superior knowledge of a

38

seller of real estate. A duty to disclose arises from superior knowledge "'where material facts are accessible to the vendor only, and he knows them not to be within the reach of the diligent attention, observation, and judgment of the purchaser.'" *Cushman v. Kirby*, 536 A.2d 550, 553 (Vt. 1987) (quoting *Lawson v. Citizens & S. Nat'l Bank*, 193 S.E.2d 124, 128 (S.C. 1972)).

The FAC, despite hundreds of paragraphs of details of the documents, transactions and events at issue, fails to present facts—as opposed to legal conclusions—that would permit a court to draw the reasonable inference that Defendants were under a duty to disclose more than they did about the change in calculation of the Shared Amenities and Services Contribution or other expected costs of services under the SAS Covenant. It is undisputed that Plaintiffs were provided with the facts about the Shared Amenities and Services Contribution calculation, including that the method of calculating it had changed, that it was an estimate and that unit owners would be responsible for actual costs. It is undisputed that Plaintiffs were provided with estimates of other costs in connection with ownership of their units. Although Plaintiffs may have viable claims that Defendants have breached the terms of their agreements, or that their disclosures violated statutory requirements, they have failed to state a claim for fraudulent nondisclosure. *See Monahan v. GMAC Mortg. Corp.*, 2005 VT 110, ¶¶ 65-69, 893 A.2d

298, 320-21 (holding that providing the lower of two repair estimates and withholding the higher one did not support an inference of fraudulent nondisclosure where the document indicated that it had been revised, and was not intended to be an estimate of the total cost for all repairs); *see also Winey v. William E. Dailey, Inc.*, 636 A.2d 744, 749 (Vt. 1993) (cautioning "against confusing principles of contract with principles of fraud so that the elements of fraud are made out by a mere breach of contract"); *Bevins v. King*, 514 A.2d 1044, 1045 (Vt. 1986) ("[P]rinciples of contract and principles of fraud must be kept separate and distinct.").

Moreover, Plaintiffs have not adequately pleaded an intention to mislead or defraud with regard to the charges and allocations that were disclosed at the 2010 budget presentation. The FAC alleges that Defendants intentionally concealed this information from the residential unit owners.  FAC ¶ 225. Although Rule 9(b) permits intent to be alleged generally, *see Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996), a fraud claim "must allege facts that give rise to a strong inference of fraudulent intent . . . [either] by (1) alleging facts to show that defendants had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *S.Q.K.F.C, Inc. v. Bell Atl. TriCon Leasing*

*Corp.*, 84 F.3d 629, 634 (2d Cir. 1996).  Although an intentional concealment of information may provide some evidence of an intent to mislead or defraud, that fact alone does not tend to show motive, conscious misbehavior or recklessness.

Plaintiffs' common law fraud claim (Count IV) is **dismissed for failure to state a claim.**

**G.    Claims that Adoption and Implementation of the SAS Covenant Violates a Covenant of Good Faith and Fair Dealing and that the SAS Covenant is Unconscionable.**

**1.**  A covenant of good faith and fair dealing is implied in every Vermont contract, and is imposed on every contract or duty governed by the VCIOA.  *See Carmichael v. Adirondack Bottled Gas Corp.*, 635 A.2d 1211, 1216 (Vt. 1993); Vt. Stat. Ann. tit. 27A, § 1-113.  The VCIOA provision "sets forth a basic principle . . .:  in transactions involving common interest communities, good faith is required in the performance and enforcement of all agreements and duties.  Good faith, as used in this Act, means observance of two standards: 'honesty in fact,' and observance of reasonable standards of fair dealing.  *Id.* official cmt.  The implied covenant "ensure[s] that parties to a contract act with 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" *Carmichael*, 635 A.2d at 1216 (quoting Restatement (Second) of Contracts § 205 cmt. a (1981)); *accord Century Partners, LP v. Lesser Goldsmith Enters., Ltd.*, 2008 VT 40, ¶ 21, 958 A.2d 627,

41

633.  "Contextual and fact-specific, the implied good-faith covenant . . . protects against 'a variety of types of conduct characterized as involving bad faith because they violate community standards of decency, fairness or reasonableness.'" *Carmichael*, 635 A.2d at 1216 (quoting Restatement § 205 cmt. a). It is "ordinarily a question of fact, one particularly well-suited for juries to decide." *Id.* at 1217.

Plaintiffs allege, among other things, that Defendants secretly charged residential unit owners with a portion of the Condominium assessments and property taxes that are allocated to the Shared Amenities Unit owner, and that the SMLCOA Board of Directors, controlled by Defendants, failed to respond in good faith to Plaintiffs' requests for information about their SAS Contributions.  Although Plaintiffs may or may not prevail at summary judgment or at trial, they have adequately stated a claim for breach of an implied or statutory covenant of good faith and fair dealing.

**2.**  As discussed above in section A., terms of a contract may be avoided as unconscionable if they are procedurally or substantively unfair.  *See Val Preda Leading*, 540 A.2d at 651.  "'The principle is one of the prevention of oppression and unfair surprise and not of disturbance of allocation of risks because of superior bargaining power.'"  *Wilk Paving, Inc. v. Southworth-Milton, Inc.*, 649 A.2d 778, 783 (Vt.

42

1994) (quoting Vt. Stat. Ann. tit. 9A, § 2-302 (1994) official cmt. 1); *see also* Vt. Stat. Ann. tit. 27A § 1-112. Assuming the truth of the allegations of the FAC, Plaintiffs have adequately stated a claim of unconscionability, and are entitled to present evidence to prove their claim.

## Conclusion

Defendants' Motion to Dismiss Plaintiffs' Amended Class Action Complaint, ECF No. 28, is **granted in part and denied in part**. Counts IV, V and VI and portions of Count I and III are dismissed for failure to state a claim upon which relief can be granted, with leave to replead these claims within thirty days of the date of this order.

Dated at Burlington, in the District of Vermont, this 20th day of March, 2012.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge